# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Brief May 5, 2009

## STATE OF TENNESSEE v. LAMAR JERMAINE THOMAS

**Direct Appeal from the Circuit Court for Madison County**
**No. 07-252     Donald H. Allen, Judge**

_____

**No. W2008-01373-CCA-R3-CD  - Filed October 21, 2009**

_____

A Madison County Circuit Court jury convicted the defendant, Lamar Jermaine Thomas, of possession with the intent to sell more than .5 grams of cocaine, a Class B felony; possession with the intent to sell morphine, a Class C felony; possession with the intent to sell dihydrocodeinone, a Class D felony; possession with the intent to sell more than one-half once of marijuana, a Class E felony; and possession of drug paraphernalia, a Class A misdemeanor. He was subsequently given an effective sentence of fourteen years in the Tennessee Department of Correction. On appeal, the defendant asserts that the evidence was insufficient to support the jury's verdicts of guilt. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and CAMILLE R. MCMULLEN, JJ., joined.

Gregory D. Gookin (on appeal and at trial), Assistant Public Defender, Jackson, Tennessee and Charles Curbo (at trial), Memphis, Tennessee, for the appellant, Lamar Jermaine Thomas.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Jerry Woodall, District Attorney General; and Shaun A. Brown and Brian Gilliam, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Background

The defendant and his co-defendant, Michael Williams, were indicted on charges of possession with the intent to sell and deliver .5 grams or more of cocaine; possession with the intent to sell and deliver morphine; possession with the intent to sell and deliver dihydrocodeinone; possession with the intent to sell and deliver more than one-half ounce of marijuana; and possession of drug paraphernalia. The defendant was also indicted on the charge of driving on a revoked

driver's license. Prior to trial, the defendant entered a guilty plea to the charge of driving on a revoked driver's license.

At the defendant's trial, the following evidence was presented. Brenda McNeil, a Jackson-Madison County Metro Narcotics Unit evidence technician, identified two items as packages she retrieved from the Jackson Police Department drop box on October 24, 2006. Ms. McNeil testified that she delivered the items to the drug vault located in the narcotic unit's office. he stated that she later delivered the items to the crime lab in Memphis on January 11, 2007, retrieved them from the crime lab on March 5, 2007, and returned the items to the drug vault. Ms. McNeil confirmed that the items were sealed when she obtained them from the drop box and that they remained sealed in her possession. She said that the red tape on the items indicated that they were opened and resealed by the crime lab. On cross-examination, Ms. McNeil stated, "Officer Dyer dropped all of the evidence into the drop box." She stated that none of the bags of evidence in this case were sent out to be tested for fingerprints. According to the descriptions provided on the evidence sheet, in one of the evidence bags were four separate plastic bags. In a second bag were "eight individual things of marijuana", in the third bag were bags of a white substance that were individually wrapped and found inside a green plastic bottle. Also found inside the green plastic bottle were tablets wrapped in plastic. The fourth bag contained "a plastic bottle containing four peach-colored tablets, five Valiums and nine Hydrocodones."

Officer Terry Dyer with the Jackson Police Department testified that at approximately one thirty on the afternoon of October 23, 2006, he was traveling eastbound on East Chester Street and saw the defendant "driving a red GMC pickup . . . westbound on East Chester[.]" Officer Dyer stated that "another black male subject [was] in the truck with [the defendant]." Officer Dyer recognized the defendant and "knew [the defendant's] driver's license [was] revoked or suspended at that time and he shouldn't be driving." He said that he "looked [the defendant] right in the face . . . [the defendant] tried to look away . . . because [the defendant] recognized him[.]" After Officer Dyer saw the defendant turn left onto Vance Street, he turned his patrol car around, drove back toward where he had seen the defendant. He spotted the defendant's truck, parked in a driveway next to a residence on Vance Street. He saw the defendant exiting the truck from the driver's side door, and his passenger exiting the truck from the passenger's side door. Officer Dyer said, "they went into a gated area at the back." Officer Dyer testified that he "stopped his car just a little bit past their house. . . [and] called for Officer Mike Stanfill, [his] partner, to come back [him] up."

When Officer Stanfill arrived, Officer Dyer "went into the gated area by the back door" and "Officer Stanfill knocked on the front door and got permission for [the officers] to come in." Officer Stanfill let Officer Dyer into the house through the back door, and Officer Dyer spoke with Michael Williams and told him that they were looking for the defendant. Officer Dyer stated that he recognized Mr. Williams as the passenger in the defendant's truck. Officer Dyer also saw "an older lady in the house[,]" whom he believed to be Mr. Williams' grandmother. The officers found the defendant hiding in a small laundry room located to the right of the back door and took him into custody. Officer Dyer described the laundry room as "a little place you walk into, . . . almost like a closet." Officer Dyer stated that they found the defendant "back up against the wall." Incident to

the defendant's arrest, Officer Dyer searched the area. He said that "in the clothes right beside where [the defendant] was standing. . . [he] started pulling [the clothes] back . . . [and] found a red box . . . contain[ing] several bags of what was determined to be marijuana." Officer Dyer said that the defendant "could've reached down with his hand and placed [something] right on top of the clothes." The red box was "on the very top of the pile," underneath "maybe one or two shirts." Officer Dyer stated that he "picked up the box to move it, [and] underneath it was a green bottle that looked like an Excedrin bottle, and inside that bottle was a plastic bag that had several smaller rocks of crack cocaine" Officer Dyer said that he "found the crack cocaine individually wrapped rocks in plastic inside some more plastic." Officer Dyer also found "four Hydrocodone pills inside that bottle." He also found a set of digital scales, "right next to [the defendant] in that pile of clothes." According to Officer Dyer, "Michael Williams stated that the marijuana was his. After the officers put the defendant in a patrol car, Officer Dyer looked into the truck that the defendant had been driving and "could see another pill bottle that contained more pills in it and more plastic wrapped pills." He also found "some more crack cocaine on the driver's side door wrapped in plastic like the ones that were in the house."

Officer Dyer identified his handwriting on the outside of an evidence bag and stated that the digital scales contained in the bag were those he found next to the defendant. He testified that it was common to find scales with narcotics if the drugs were "for resale." He also stated that drugs were usually sold by weight. Officer Dyer identified another evidence bag containing "a red box with marijuana" and a third evidence bag containing "a green bottle that contained the crack cocaine[,]" and "Hydrocodone, Valium and . . . [an] unknown peach-colored pill[.]" He identified a forth evidence bag containing "Hydrocodone tablets." Officer Dyer stated that he sealed the bags, marked their contents on the outside, and placed the bags in the vault. Officer Dyer stated that he received the defendant's driving history from the department of safety which indicated that the defendant's driver's license was revoked. According to Officer Dyer, the narcotics found in the search incident to the defendant's arrest were "definitely wrapped with intent to resale."

On cross-examination, Officer Dyer stated that a "personal stash" of drugs would not usually be kept in individual bags. He agreed that Mr. Williams claimed the marijuana in the red box and "he didn't claim any of the other stuff." According to Officer Dyer's incident report, when Mr. Williams was booked, he had "a single Diazepam which is Valium[,]" in his back pocket that matched the Diazepam found inside the truck. He stated that fingerprint tests were not ordered on any of the evidence obtained in the search. Officer Dyer said that the scales found next to the defendant measured in grams and that in his experience, "[m]ost of the time the scales are [found] with the dealers." He stated that scales are not usually found with people buying drugs for personal use. Officer Dyer confirmed that Mr. Williams told them that he lived in the residence on Vance Street with his grandmother. On redirect examination, Officer Dyer further confirmed that Mr. Williams was also arrested. He agreed that fingerprints are very fragile evidence. He stated that the surface of an object makes a "very big difference" in whether discernable prints are left behind. On recross-examination, Officer Dyer reviewed his report and testified that according to his report, he "looked inside [the defendant's] truck and saw a plastic bottle with nine or more Hydrocodone tablets in plain view near the steering wheel on a pouch on the dash."

Officer Mike Stanfill with the Jackson Police Department testified that on October 23, 2006, he was called to a residence on Vance Street. (124) When he arrived at the residence, Officer Dyer was "at the rear . . . of the residence." Officer Stanfill "[k]nocked on the [front] door and made contact with a Michael Williams." He told Mr. Williams that he was looking for the defendant. Mr. Williams invited him inside the residence and Officer Stanfill looked through the house in search of the defendant. The defendant was found in the laundry room and was arrested. On cross-examination, Officer Stanfill stated that he transported the defendant to jail. He did not recall the defendant claiming any of the drugs. He stated the no fingerprint tests were ordered on the evidence. Officer Stanfill agreed that fingerprinting evidence might have been a way to determine the owner of the drugs.

Jessica Lynn Marquez, a forensic scientist with the Tennessee Bureau of Investigation (TBI), testified that on January 11, 2007, she examined the contents of evidence bags received in connection with this case. One of the evidence bags held "a red box with velvet outer coating" containing "a clear plastic bag . . . [with] eight clear plastic bags that were tied with knots[.]" The contents of the eight plastic bags weighed 15.2 grams; more than one-half of one ounce. Ms. Marquez stated that she performed a microscopic examination and a chemical color change test on the contents of the eight bags and determined it was marijuana. Ms. Marquez stated that in another bag, she found a green plastic pill bottle. She weighed and tested one substance found in the bottle and determined that it was 2.7 grams of a cocaine based substance. Ms. Marquez stated that the bottle also contained another item, which was similar in appearance to the item determined to contain cocaine, that she did not test due to TBI lab policy. The untested item and the bag containing it weighed 14.5 grams. Ms. Marquez stated that another bag contained "one tablet that was loose, and . . . a clear plastic bag . . . tied in a knot that contained three tablets." She stated that the tablets were marked "Watson 349." The computer database identified the markings on the tablets as the manufacturer's designation for dihydrocodeinone tablets. Ms. Marquez also tested the pills with an instrument used to separate components and confirmed that the pills were dihydrocodeinone. Ms. Marquez stated that another evidence bag contained "a plastic pill bottle with tablets in it." Ms. Marquez said that from that bag, she "only tested one particular type of tablet." Both the computer database and her instrumental analysis indicated that the tablets tested were morphine. Ms. Marquez stated that after she inspected the evidence, she placed it back in the bags, and resealed the bags with evidence tape. The bags were given to "a forensic technician, and . . . place[d] . . . into the vaults of the laboratory[.]" Ms. Marquez identified her report and confirmed that the conclusions regarding the evidence in her report were the same as the conclusions that she testified to at trial.

On cross-examination, Ms. Marquez stated that she generally used a scalpel, to obtain a testing sample and either threw the scalpels away or cleaned them between samples with "a one to ten dilution of bleach and water mixture." She did not know the efficiency rate of the cleaning solution, but stated, "it would clean it fairly well of any contaminant that might be there." Ms. Marquez testified that in testing for cocaine she used a gas chromatograph mass spectrometer, an infrared spectrometer and a combination instrument called a gas chromatograph infrared instrument. She stated that without the machine's analysis of "cocaine" she "would be able to recognize it" from

the graph. She used a gas chromatograph mass spectrometer to test the morphine tablets. She stated that the results for morphine would be different than results from another opiate[.]" Ms. Marquez stated that she determined the weight of the substance identified as marijuana by subtracting the weight of the bags containing the marijuana from the total weight of the sample. She agreed that the weight of marijuana could change with higher humidity. However, she did not consider that a factor in the weight of the sample and said, "in this case the marijuana was dry. Otherwise [she] would have noted that." She stated that fingerprint tests of the evidence were not requested.

On redirect examination, Ms. Marquez stated that the TBI crime laboratory was accredited by the American Association of Crime Laboratory Directors. She stated that the accreditation required certain standards be maintained in the cleaning of instruments. Ms. Marquez was not aware of any past problem with cleaning or contamination at the TBI laboratory. She confirmed that the machine that tested for cocaine did not tell her what the substance was, but gave her a graph to read. She stated she "did two tests on every item."

The defendant chose not to testify. He presented as his only witness Mr. Williams, his co-defendant, who had entered a plea agreement with the state before the trial. Mr. Williams testified that in October of 2006, he was arrested at his residence on Vance Street. Mr. Williams took full responsibility for the drugs. He agreed that as a result of his arrest, he plead guilty to possession with the intent to sell .5 grams or more of cocaine. On cross-examination, Mr. Williams said that he would not testify regarding the events of the day of his arrest and stated "I'm going to take the Fifth."

The jury returned verdicts of guilty and the defendant was convicted of possession with the intent to sell .5 grams or more of cocaine; possession with the intent to sell more than one half of one ounce of marijuana; possession with the intent to sell morphine; possession with the intent to sell dihydrocodeinone; and possession of drug paraphernalia. The defendant was sentenced to an effective term of fourteen years in the Tennessee Department of Correction. The defendant has appealed.

II. Analysis
Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to sustain his convictions. Specifically he argues that "[t]he evidence was insufficient for the jury to convict [him] of possession with the intent to deliver/sell any of the controlled substances that were discovered by Officer Dyer." He further asserts that even if the evidence supports constructive possession of the drugs by the defendant the lack of "common indicators of intent to resell[,]" and the amounts of the drugs, did not show "anything other than intent of personal use." Finally, the defendant asserts that Mr. Williams took full responsibility for all the drugs found.

Upon review, we reiterate the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the

burden of demonstrating to the appellate court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict, approved by the trial judge, accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987). However, the circumstantial evidence "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 613.

"'[P]ossession" may be either actual or constructive" and may be proven by circumstantial evidence. *See State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (citing *State v. Patterson*, 966 S.W.2d 435, 444-45 (Tenn. Crim. App. 1997); *State v. Brown*, 915 S.W.2d 3, 7 (Tenn. Crim. App.1995)) ; *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). Constructive possession requires proof that a person had the power and intention at a given time to exercise dominion and control over the drugs either directly or through others. *Shaw*, 37 S.W.3d at 903 (citing *State v. Patterson*, 966 S.W.2d 435, 444 (Tenn. Crim. App. 1997)). In essence, "constructive possession is the ability to reduce an object to actual possession." *State v. Ross*, 49 S.W.3d 833, 845-46 (Tenn. 2001) (citations omitted). However, the mere presence in an area where drugs are discovered, or the mere association with a person who is in possession of drugs, is not, alone, sufficient to support a finding of constructive possession. *Shaw*, 37 S.W.3d at 903 (citing *Patterson*, 966 S.W.2d at 445).

Where the evidence shows that illegal drugs were found under the dash on the driver's side of a defendant's automobile, within his reach, an inference may be drawn that the drugs were in the defendant's constructive possession. *See State v. Yarbro*, 618 S.W.2d 521, 525 (Tenn. Crim. App. 1981) (citing *Armstrong v. State*, 548 S.W.2d 334, 336-337 (Tenn. Crim. App. 1976); *Whited v. State*, 483 S.W.2d 594, 596 (Tenn. Crim. App. 1972)). "Notably, a defendant's possession of

contraband may be inferred from a defendant's ownership or control over a vehicle in which the contraband is secreted." *State v. Richard Wayne Hampton*, No. W2006-02189-CCA-R3-CD, 2008 WL 169645, at *6 (Tenn. Crim. App., at Jackson, Jan. 18, 2008), *perm. app. denied* (Tenn. Jul. 7, 2008) (citation omitted).

The intention to sell or deliver drugs may be inferred from the amount of the drug possessed by the accused along with other relevant facts surrounding the arrest. *See* Tenn. Code Ann. § 39-17-419; *see also State v. John Fitzgerald Belew*, W2004-01456-CCA-R3-CD, 2005 WL 885106, *5 (Tenn. Crim. App., at Jackson, Apr. 18, 2005) (noting that the jury can infer intent to sell or deliver when amount of controlled substance and other relevant facts surrounding arrest are considered together). The amount the drugs and the manner in which it was packaged may also support an inference of intent to sell. *See State v. Brown*, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995).

After reviewing the evidence in the light most favorable to the state, we conclude that the evidence was sufficient to establish the defendant's guilt, beyond a reasonable doubt. The evidence showed that Officer Dyer spotted the defendant driving a truck and knew that his license had been revoked. Officer Dyer testified that he saw the defendant exit the truck from the driver's side door and enter a residence on Vance Street. Upon entering the house, Officers Dyer and Stanfill found the defendant hiding in a small laundry room. In a pile of clothes within easy reach of the defendant, Officer Dyer found a box containing what was later determined to be 15.2 grams of marijuana and digital scales. Under the box, Officer Dyer found a green pill bottle containing what was later determined to be 2.7 grams of a substance containing cocaine, and tables of dihydrocodeinone. Officer Dyer stated that the drugs were separately wrapped in plastic. He testified that, in his experience, individually wrapped drugs were indicative of an intent to sell. He further stated that it was common to find scales along with drugs when the drugs were for resale. Officer Dyer also retrieved from the driver's side door panel of the truck driven by the defendant, a plastic bag containing what appeared to be cocaine rocks, also individually wrapped. Also in the truck and within reach of the driver, Officer Dyer found a plastic bottle containing individually wrapped morphine tablets and other unidentified pills. In our view, the jury could reasonably infer from the evidence that the defendant had dominion and control over items found next to him in the laundry room. Further, the jury could have reasonably concluded from the evidence that the defendant had dominion and control over the items found in the driver's side door panel of the truck and the morphine tablets found in the plastic bottle on the dash near the steering wheel. Therefore, the evidence was sufficient to establish that the defendant had constructive possession of the items found in the laundry room and in the truck. Accordingly, the evidence was sufficient to show that the defendant was in possession of 15.2 grams of marijuana, 2.7 grams of cocaine, dihydrocodeinone tablets, morphine tablets and digital scales.

The evidence is also sufficient to establish that the defendant had the intent to sell the drugs found in his possession. The testimony of Officer Dyer supports that scales are commonly found with drugs that are intended for resale. Furthermore, the cocaine, the marijuana, and the dihydrocodeinone tablets were individually wrapped and the morphine tablets were stored in a plastic bag inside a pill bottle with other drugs that were individually wrapped. Officer Dyer testified that,

based on his experience in law enforcement, the packaging of the drugs found in the defendant's possession indicated that they were intended for resale. Also, the amounts of cocaine and marijuana support that those drugs were intended for resale. In the past, we have affirmed convictions where testimony or evidence allowed the jury to draw a permissible inference from the facts surrounding the arrest of a defendant that the defendant had intent to sell or deliver drugs in his possession. *See Reid*, 91 S.W.3d at 277; *State v. Jerion Craft,* No. W2008-00869-CCA-R3-CD, 2009 WL 2634635, at *3 (Tenn. Crim. App., at Jackson, Aug. 27, 2009) (citing *State v. Chearis*, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999)). Finally, it was within the jury's providence to accept or reject Mr. Williams' testimony that the drugs belonged to him. *See Bland*, 958 S.W.2d at 659. We conclude that based upon the evidence presented at trial a reasonable jury could have found the defendant guilty of the offences charged. Therefore, the defendant is without relief on this issue.

## III. Conclusion

Based on the foregoing, this court affirms the judgments of the trial court.

_____
J.C. McLIN, JUDGE